In re STANDARD GAS & ELECTRIC CO.
No. 1204.

District Court, D. Delaware.
Feb. 2, 1939.

640

Arthur T. Vanderbilt, of Newark, N. J., Robert H. Richards (of Richards, Layton & Finger) and Clarence A. Southerland (of Ward & Gray), all of Wilmington, Del., and A. Louis Flynn (of Hagenah & Flynn), of Chicago, Ill., for debtor.

Seibert & Riggs, of New York City, for Standard Power & Light Corporation.

Holthusen & Pinkham and Baldwin, Todd & Young, all of New York City, and Hugh M. Morris and Ivan Culbertson, both of Wilmington, Del., for McAneny committee.

William M. Chadbourne, of New York City, and Leonard G. Hagner, of Wilmington, Del., for Allen committee.

Raymond L. Wise and Nevius, Brett & Kellogg, all of New York City, and William T. Knowles, of Wilmington, Del., for Kinnear committee.

Wagner, Quillinan & Rifkind, of New York City, and Marvel, Morford & Logan, of Wilmington, Del., for Gerard committee.

Javits & Javits, of New York City, and Stewart Lynch (of Biggs & Lynch), of Wilmington, Del., for McRoberts committee.

Battle, Levy, Fowler & Neaman, of New York City, and Hering, Morris, James & Hitchens, of Wilmington, Del., for Mac-Gowan committee.

Edward M. Garlock, of New York City, for Herman E. Horwood, a stockholder.

Archibald Palmer and Benjamin A. Hartstein, both of New York City, for bondholders.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City, for Guaranty Trust Co. of New York.

Milbank, Tweed & Hope, of New York City, for Chase Nat. Bank of City of New York.

Maurice Kozinn (of Kozinn & Kozinn), of New York City, for preferred stockholder.

NIELDS, District Judge.

Hearing of petitions for allowances.

Debtor is a public utility holding company incorporated under the laws of Delaware in 1910. Its subsidiary companies furnish electric power, electric light, gas, steam, telephone, water and transportation service in various parts of the United States and to a small extent in Mexico. It is one of the largest public utility holding companies in the United States. It has over one hundred and twenty companies in its system serving 1600 communities in 20 States.

April 1, 1935, a creditors' petition under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, was filed against the debtor. To this the debtor made answer. September 27, 1935, debtor filed its voluntary petition which was thereupon approved and debtor was continued in possession. The creditors' petition was dismissed.

To the debtor's petition was attached a plan for the extension of its notes coming due October 1, 1935. The necessary acceptances were not obtained. This abortive attempt to obtain a voluntary extension cost the company $750,000. However, the consents obtained through that expenditure were later utilized in putting through the accepted plan.

The capital structure of the debtor, as of September 27, 1935, when the reorganization petition was filed, was as follows:

## Funded Debt.

| Issue | Maturity | | | Outstanding |
|---|---|---|---|---|
| Twenty Year Six Per Cent Gold Notes | October | 1, | 1935 | $14,823,000 |
| Six Per Cent Convertible Gold Notes | October | 1, | 1935 | 9,826,500 |
| Six Per Cent Gold Debentures: | | | | |
| Series A | February | 1, | 1951 | 15,000,000 |
| Series B | December | 1, | 1966 | 10,000,000 |
| Six Per Cent Gold Debentures issued by Standard Power and Light Corporation and assumed by Standard Gas and Electric Company | February | 1, | 1957 | 24,000,000 |

## Capital Stock.

| Class | Authorized | Outstanding |
|---|---|---|
| Prior Preference Stock (no par value) | 750,000 [a] | |
| $7.00 Cumulative | | 368,348 [b] |
| $6.00 Cumulative | | 100,000 |
| $4.00 Cumulative Preferred Stock (no par value) | 1,500,000 | 757,442 [c] |
| Common Stock (no par value) | 10,000,000 | 2,162,607 [d] |

March 5, 1938, when the plan of reorganization was approved, the debtor's capital structure was identically the same as tabulated above and as it was when the petition for reorganization was filed.

A vital question is the extent to which the reorganization benefitted the debtor and its security holders. In determining this question two considerations stand out: (1) The capital structure of the debtor is precisely the same today as it was before these proceedings were instituted; (2) the final plan, as approved by the court on March 5, 1938, is identical with the plan of extension proposed by the debtor before the reorganization proceedings and the rights of the various security holders have not been changed except (a) the notes maturing October 1, 1935, are extended to May 1, 1948 instead of October 1, 1940; (b) the supplemental indenture contains a negative pledge clause, a sinking fund clause and a clause restricting the payment of dividends; and (c) the note and debenture holders, as a class, have the right to elect 1 out of 9 directors, the holders of the prior preference stock have the right to elect 2 out of 9 directors, the holders of the $4 cumulative preferred stock have voting power on all questions and the right to elect 2 out of 9 directors, and the holders of the common stock lose the sole voting power but continue to have voting power on all questions and the right to elect 4 out of 9 directors.

This was not a genuine reorganization. The approved plan failed to reduce interest charges or to obtain a longer extension of the debentures or to lower dividend rates, or to wipe out dividend accruals on preferred stock, or to convert some of the preferred stock into common stock. Attempts were made in these directions but all failed.

The corporation went into reorganization top-heavy and top-heavy it came out. The arrearages on the preferred stock instead of being reduced were increased by more than $15,000,000 from the time of filing the petition to the date of the approval of the plan. Tax claims asserted by the Government are still asserted and unpaid. Stock of the debtor's most important subsidiary is pledged to secure their payment. The reorganization did not dispose of substantial demands that had been asserted against the company. Counsel for the debtor contested but a single small

[a] Stock of this class is issuable in series—430,000 shares have been designated $7.00 Cumulative; 100,000 shares have been designated $6.00 Cumulative; 220,000 shares (unissued) not designated.

[b] The 368,348 shares outstanding do not include 9,652 shares in the treasury.

[c] The 757,442 shares outstanding do not include 200 shares in the treasury.

The 757,442 shares include 53 shares issued in the names of nominees and held for delivery in exchange for outstanding scrip.

[d] The 2,162,607 shares include 639 shares issued in the name of a nominee and held for delivery in exchange for outstanding scrip.

claim. Except for the action which is now pending against the directors and others (referred to as the Hastings or Delevan action) no steps have been taken to bring in a single asset. It is certain that further readjustments of the corporate structure ultimately will be required. The annual net income of the debtor for the twelve months ended August 31, 1938 was less than $1,525,000—a drop of approximately $600,000 from the preceding twelve months. Under the plan of reorganization this income will be subject to a deduction for sinking fund requirements of approximately $625,000. The $900,000 remaining available for dividends is quite inadequate to meet the annual dividend requirement of $6,000,000 upon the three classes of preferred stock. To accomplish this "reorganization" took two and one half years.

Forty petitions for allowances have been filed in this proceeding. They are tabulated in the footnote.* The total compensation requested amounts to $1,372,236.47 and the total expenses amount to $84,932.35.

These allowances are sought by fourteen (14) law firms, thirteen (13) individual lawyers, twenty-eight (28) committeemen and their agents, and nine (9) banks. The size of their claims is largely due to a duplication of services. This duplication may be placed in three groups: (1) Relating to the plan; (2) relating to the subsidiaries; and (3) in connection with the Hastings or Delevan action. Passing the duplication of services relating to the plan which will be considered under individual petitions, I turn to services to subsidiaries. During the two and one half years debtor was in reorganization various matters arose in connection with its subsidiaries. All of these were handled by Hagenah and Flynn, general counsel for the debtor, usually assisted by local counsel. Typical of this duplication of service is the case of Deep Rock Oil Corporation. This company was in reorganization in the United States District Court in Oklahoma. One of the questions involved was the open account claim of the debtor. This

*Summary of Applications.

| | Fees | Expenses | Total |
|---|---|---|---|
| Attorneys for Debtor | $340,000.00 | $24,658.25 | $364,658.25 |
| Hastings Action | 160,000.00 | 4,675.32 | 164,675.32 |
| **Bondholders Committees:** | | | |
| McRoberts: | | | |
| Committee | 81,250.00 | 18,729.54 | |
| Counsel | 145,000.00 | 3,788.57 | 272,640.32 |
| Agents | 23,750.00 | 122.21 | |
| Kinnear: | | | |
| Committee | 15,000.00 | 680.68 | |
| Counsel | 40,500.00 | 227.26 | 57,907.94 |
| Agents | 1,500.00 | 0.00 | |
| McAneny: | | | |
| Committee | 12,500.00 | 3,479.11 | |
| Counsel | 59,000.00 | 976.24 | 75,955.35 |
| Agents | 0.00 | 0.00 | |
| **Stockholders Committees:** | | | |
| Gerard: | | | |
| Committee | 88,000.00 | 5,818.03 | |
| Counsel | 82,000.00 | 732.78 | 209,050.81 |
| Agents | 32,500.00 | 0.00 | |
| Allen: | | | |
| Committee | 15,000.00 | 1,222.62 | |
| Counsel | 52,500.00 | 2,360.77 | 71,083.39 |
| Agents | 0.00 | 0.00 | |
| MacGowan: | | | |
| Committee | 12,000.00 | 3,984.29 | |
| Counsel | 42,000.00 | 1,069.35 | 59,053.64 |
| Agents | 0.00 | 0.00 | |
| **Miscellaneous:** | | | |
| Siebert & Riggs | 2,500.00 | 131.74 | |
| Palmer & Hartstein and Agents | 21,000.00 | 1,027.81 | 50,618.21 |
| Garlock | 25,000.00 | 430.81 | |
| Kozinn | 500.00 | 27.85 | |
| Bank Depositaries | 74,011.01 | 9,940.33 | 83,951.34 |
| Bank Trustees | 46,725.46 | 848.79 | 47,574.25 |
| Grand Totals | $1,372,236.47 | $84,932.35 | $1,457,168.82 |

court authorized the employment of Nathan A. Gibson, a capable and experienced lawyer, resident in Oklahoma. Campbell, a partner of Hagenah and Flynn, spent considerable time assisting Gibson. Richards and Southerland were also consulted. A compromise was approved by the district court and affirmed by the circuit court of appeals. Very recently certiorari was granted by the Supreme Court of the United States.

Many of the petitioners include in their petitions claims based upon an examination of the Deep Rock situation, including Javitz and the McRoberts committee, Seidman & Seidman, accountants for the McRoberts committee, the Gerard committee and the Allen committee and its counsel. It is nowhere shown that any of the services of these claimants assisted the counsel of the debtor in the prosecution or compromise of the Deep Rock claim in Oklahoma. The same is true as to services rendered California-Oregon Power Company, Wisconsin Public Service Corporation and Mountain States Power Company, all subsidiaries of the debtor.

The last duplication was of services in connection with the Delevan action. Daniel O. Hastings was appointed special trustee to prosecute certain causes of action in favor of the debtor against some of its former officers, directors and others, and to that end has instituted proceedings in this court. His complaint sets forth nineteen causes of action. Fifteen deal with alleged purchases of property by H. M. Byllesby & Co. and resale to the debtor at a profit. The sixteenth and seventeenth relate to alleged improper profits enjoyed by Byllesby and Ladenburg, Thalmann & Co. in the acquisition by debtor of the Philadelphia Company properties. The eighteenth and nineteenth causes of action charge that the debtor participated illegally in the settlement of the so-called Heil and Marco litigations. The duplication of services in connection with the Delevan action may be divided into two classes: (1) Investigation and determination of the existence of causes of action, and (2) opposition to a proposed compromise of the litigation.

## Law.

■ "One of the controlling reasons for the enactment of section 77B was the desire to reduce the cost of reorganization." Callaghan v. Reconstr. Finance Corp., 297 U.S. 464, 469, 56 S.Ct. 519, 521, 80 L.Ed. 804. Section 77B permits the court to allow reasonable compensation for services rendered "in connection with the proceeding and the plan".

■■ In the matter of allowances a distinction should be made between committees and a debtor in possession. The committees are voluntary organizations of security holders who employ counsel, accountants, engineers, advisors and secretaries at their own risk and without authority of court. They can properly claim compensation only for the benefit they bestow upon the debtor. The debtor in possession employs counsel and assistants by express authority of court. Thus a debtor in possession, special counsel or trustees representing the court should be compensated for their services to the debtor or its estate.

■ In determining whether services rendered can be charged to the estate the primary question is what benefit did they confer upon the debtor. It was intended to reasonably compensate out of the funds of the estate those whose services were deemed by the court to have been of benefit to the estate. In this proceeding substantially the only result accomplished which benefited the debtor was an additional extension of the notes and representation of security holders on the board of directors. All parties conceded from the beginning that a further extension of the notes was required.

■ The evidence shows that an enormous amount of time was consumed by committees and their counsel in negotiating conflicting interests and claims of the various security holders. These negotiations were fruitless. The holders of securities came out of reorganization as they went in.

"To call such meetings 'conferences over a plan of reorganization' is a misnomer. * * * The estate is not benefited one cent by such disputes. The fund is not increased a mill by such conferences. * * And worse still, if compensation be allowed for all services thus rendered in disputes between different classes of creditors, there is encouragement extended to counsel to prolong negotiations and encouragement to representatives of certain interests to create a nuisance value which it is the avowed purpose of section 77B to prevent." In re 211 East Delaware Place Bldg. Corporation, D.C., 13 F.Supp. 473, 474.

■ As to the duplication of services, this court has said: "Where numerous persons

participated in rendering one service susceptible of being rendered by one person, needless duplication results which should not form the basis of compensation." In re National Department Stores, D.C., 11 F. Supp. 633, 638.

### PETITIONS FOR ALLOWANCES.

#### Hagenah and Flynn.

This law firm asks for an allowance of $180,000 and $21,439.80 for expenses. They have received on account $15,000 and $3,992.54 expenses. For many years they had acted as attorneys for the debtor. During the period from 1933 to 1937 they received substantial fees from the debtor and its subsidiaries. In connection with the effort to obtain a voluntary extension of the 1935 notes, the firm received a fee of $75,000. They are still counsel for the company. Their present claim covers the period from September 27, 1935, the date of the filing of the reorganization petition, to August 2, 1938, the date of the final decree.

Petitioners bore the primary responsibility of this proceeding. Their services relate to (a) general legal business of the debtor, and (b) the reorganization proceedings as such. About two-fifths of their services were rendered in the first class, and the remaining three-fifths in connection with the second class. The services in the first class may be briefly stated to be those involving problems in connection with Mountain States Power Company, California-Oregon Power Company and Wisconsin Public Service Corporation. They advised the debtor with reference to refunding by other subsidiaries, for example, Northern States Power Company and Oklahoma Gas and Electric Company. They collaborated with Gibson in connection with the affairs of Deep Rock Oil Corporation. They advised the debtor with respect to the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq., and the Federal Power Act, 16 U.S.C.A. § 791 et seq. They prepared the registration statement to be filed with the Securities and Exchange Commission. They opposed both in this court and the court of appeals the Delevan and Graham petitions. They resisted income tax claims and filed annual reports of the debtor. They attended meetings of the board of directors and advised with respect to the debtor's business. In brief, as Flynn testified, his firm was "constantly at the elbow of the officers of the debtor for any purpose for which they might see fit to call on them".

Services of this law firm in connection with the reorganization may be briefly stated. They successfully resisted a petition filed in the district court of Illinois asking that court to take jurisdiction of the company. They participated in resisting the effort of certain creditors to restrain the payment of interest due October 1, 1935, and later participated in an arrangement for the regular payment of interest as it became due semiannually on the notes and debentures. They participated in the hearings in opposition to the appointment of a trustee. They participated in all negotiations with respect to the various drafting of plans of reorganization. They participated in the hearings on plans. They drafted forms of acceptance of the plan. They drafted the order of confirmation and the necessary documents to carry the plan into effect. Flynn spent over half of his time on debtor's business away from his office in Chicago.

█ For these services petitioners will be allowed seventy-five thousand dollars ($75,000) and their expenses of twenty one thousand four hundred thirty-nine dollars and eighty cents ($21,439.80), less payment heretofore made on account of both compensation and expenses.

#### Richards, Layton and Finger and Ward and Gray.

These law firms ask for $150,000 compensation and $2,671.17 expenses. They had assisted in advising the debtor for upwards of ten years in various important matters. No reason for two law firms rather than one was disclosed by the debtor. In fact the petitioners testified that they regarded themselves as one firm and petitioned for an allowance as such. They were not merely local counsel but were of counsel for the debtor by appointment of the court. In all hearings in this court the debtor was represented by them after prior conferences with Flynn. Neither Richards nor Southerland "attended any of the meetings of the committees" when plans of reorganization were discussed. The firm together with Flynn filed an answer to the creditors' petition and subsequently procured the dismissal of the same. They opposed a motion by Adler, et al. to dismiss the debtor's petition. The motion to dismiss was denied and an appeal was allowed Adler. The three law firms as attor-

neys for the debtor filed printed briefs in the court of appeals. The appeal was argued by Richards and Southerland November 26, 1935. That court dismissed the appeal and remanded the matter to the district court. The progress of this proceeding was not again interfered with by any other independent proceedings.

The legal services performed by these firms for the debtor were not confined to proceedings in this court but included conferences with Flynn and the usual run of legal services in advising a large public utility holding corporation. Routine services were performed by Hagenah and Flynn in Chicago, but all more important matters received the joint consideration of the three law firms. This involved voluminous correspondence, drafting of papers, conferences and the like. A brief summary of the work done by petitioners is the following: They drafted and presented debtor's original petition for reorganization and obtained an order approving the petition and continuing the debtor in possession. They resisted the application to enjoin the payment of interest due October 1, 1935. Payment was authorized by this court. They appeared before the court of appeals on the appeal from this order and the appeal was dismissed. They assisted in the preparation of a petition and at the hearing thereon concerning the subordination of the debt of Mountain States Power Company to debtor to enable the power company to borrow. They opposed the petition of Delevan Corporation and Graham for leave to prosecute a stockholders' action in New York against the debtor and certain of its officers to recover assets alleged to belong to the debtor. They prepared and presented briefs in the court of appeals in support of the order of this court denying the prayer of the Delevan and Graham petition. While taking a neutral stand in the matter of the acceptance or rejection of the offer of compromise of certain of the causes of action set up in the Hastings suit, they prepared a report by the debtor to the court of the offer of settlement and attended before the special masters for the purpose of furnishing any information in the possession of the debtor desired by them. They considered the duties and obligations of the debtor under the Public Utility Holding Company Act of 1935. They attended court in opposition to the petitions of the Allen committee and McAneny committee with respect to a hearing on plans of reorganization. They assisted in the preparation of papers and in conducting the hearing for authority to compromise the claim of the debtor against the Deep Rock Oil Corporation through the medium of a plan of reorganization of that company in Oklahoma. They considered the suit brought by Garlock, as attorney for Horwood, in New York, based on some of the same causes of action in the Hastings suit and obtained a rule to show cause why Horwood should not be enjoined from prosecuting his action. They considered and studied each of the three amended plans of reorganization. They took the necessary steps to secure the consent of the United States to the approval of the plan of reorganization dated as of November 1, 1937, including the preparation of the deposit agreement with Wilmington Trust Company and the deposit with that company of securities of the principal subsidiary of the debtor to secure the payment of Government taxes. In addition, the office of Ward and Gray was designated as depositary of all claims against the debtor. Two hundred and ninety-three proofs of claim by creditors and three hundred and sixty-three proofs of interest by stockholders were filed involving considerable routine correspondence. Only one small claim was objected to.

For these services considered as one claim and as though the claimants were in effect but one firm, the court will allow fifty thousand dollars ($50,000) compensation, and two thousand six hundred seventy-one dollars and seventeen cents ($2,671.17) expenses.

### Nathan A. Gibson.

Petitioner asks for an allowance, on account, of $10,000 and expenses. He was first employed by debtor in May, 1933, to present its claim against Deep Rock Oil Corporation, then in receivership in the Northern District of Oklahoma. Debtor's claim amounted to $9,342,000. Subsequently Deep Rock Oil Corporation filed its voluntary petition under Section 77B in Oklahoma and Gibson filed a claim on behalf of the Debtor in that proceeding. The district court in Oklahoma first rejected the compromise plan of reorganization of Deep Rock but after two years of persistent effort the petitioner induced the trial court to reverse its original position and accept the compromise. Thereafter he secured an affirmance of this acceptance by the court of appeals. Certiorari

646

by the Supreme Court of the United States has recently been granted.

█ Prior to the present application petitioner received from debtor $25,000. In full settlement of the services set out in petitioner's application he will be allowed a fee of ten thousand dollars ($10,000), in addition to the amounts heretofore paid to him, and the sum of five hundred forty-seven dollars and twenty-eight cents ($547.28) expenses.

### Gerard Committee.

This committee was formed in September, 1935, and was authorized to intervene. It consisted of James W. Gerard, John M. Budinger, J. Cheever Cowdin, William Rosenblatt and Charles J. Williams. Garrettson Dulin was a member until his death July 23, 1937. The committee represented 73,550 shares of $7 prior preference stock out of 368,340 shares outstanding, also 29,437 shares of $6 prior preference stock out of 1,000,000 shares outstanding. At the outset the committee employed Jack Coles as advisor, Joseph M. Lobel as secretary, and Alexander Weinstein as consultant engineer. Counsel for the committee were Wagner, Quillinan and Rifkind.

Gerard, chairman of the committee, originally petitioned for an allowance of $18,000 and the other members of the committee save one petitioned for an allowance of $15,000. The executor of the deceased member petitioned for an allowance of $10,000. The committee has petitioned for reimbursement of expenses totaling $5,818.03. Shortly prior to the hearing Gerard reduced his application from $18,000 to $8,000 and the other living members of the committee reduced their applications from $15,000 to $8,000. The advisor asks for $15,000 which he reduced to $8,000. The secretary asks for $7,500 and the consultant engineer for $10,000.

Rosenblatt, a committee member, being the owner of something over 1,000 shares of prior preference stock initiated the organization of the committee, primarily to protect his own stock. Other holders of large blocks of stock consulted him and asked him to cooperate with them in the protection of the stock. Throughout the 3 years the committee held 32 meetings. While all meetings were not attended by all members of the committee no important action was taken until all members had been consulted. A vast amount of correspondence as well as many conferences were conducted with other committees, the debtor, counsel and others interested in the reorganization. From the start the committee adopted the policy of keeping prior preference stockholders fully informed of the developments of the reorganization. To that end the committee prepared from time to time printed letters containing summaries of the proceedings. The first of such letters was sent out October 31, 1935 and the last December 16, 1937. In all six letters were prepared and mailed. With most of the letters the committee sent forms of proxies.

Petitioners claim that the services rendered by them in this proceeding were of considerable value to the debtor and contributed to the plan of reorganization. What were the services? At the start the committee conceived of a genuine plan of reorganization and spent months in attempting to make that plan effective. Rosenblatt testified: "Our object from the start was to try to assist and work out some plan whereby the whole structure of the Standard Gas would be more logical and more sound, and it was our object, right from the start, to try to work on something that would scale down the arrears of the dividends on the preferred stock, and get a more logical reorganization, and we devoted a great deal of time, our committee had approved a plan of taking common stock in place of the past due dividends on the preferred stock, but when the $4 preferred committee did not want to come along with us and take junior securities for their $4 preferred, it changed the whole situation. Months and months of effort went away in that particular work." These suggested features, however, are all absent from the amended plan of reorganization confirmed by the court. Failing in its original objectives, the committee successfully contended for a sinking fund dependent on earnings. Moreover the committee successfully fought for a limitation upon the amount of the sinking fund, namely, 50% of the first million dollars and 25% of all additional net income but in no event to exceed $1,104,742.50 in any one year. The committee provided for a reduction of the funded debt by applying the proceeds of sales of assets thereto. This committee insisted that a majority of the board should be elected by the holders of securities other than the common stockholders. This point was debated over a

considerable period of time by the various committees. Ultimately the amended plan contained a provision which embodied the views of this committee.

This committee dealt with approximately 20 different printed proofs of proposed plans as well as a large number of typewritten copies. By August, 1937, it was found possible to obtain the consent of all the committees except one to a single plan of reorganization. The salient terms of this plan were the familiar ones heretofore discussed and the provisions "prohibiting the company from creating or assuming additional indebtedness except in the ordinary course of business and prohibiting the company from mortgaging or pledging any of its assets [unless the funded debt was given equal and ratable security on all assets], except $7,500,000 of current assets". December 16, 1937, this committee joined with four other protective committees in a letter to all security holders. This letter referred to the filing of the plan dated November 1, 1937, and stated that the committees had entertained divers views with respect to the terms of the plan but had compromised on a basis that appeared fair to all.

■ The following amounts will be allowed to members of the Gerard committee: James W. Gerard, eight thousand dollars ($8,000); William Rosenblatt, seven thousand dollars ($7,000); John M. Budinger, five thousand dollars ($5,000); Charles J. Williams, five thousand dollars ($5,000); J. Cheever Cowdin, two thousand dollars ($2,000); the estate of Garrettson Dulin, one thousand dollars ($1,000). The expenses of the committee amounting to five thousand eight hundred eighteen dollars and three cents ($5,818.03) will be allowed.

### Jack Coles.

■ The Gerard committee asks an allowance of $15,000 for Jack Coles as "advisor to the committee". Coles voluntarily reduced his request to $8,000. He had no experience with Public Utilities Company management as a director or officer. He testified that he served the committee in two capacities: (1) As an advisor, and (2) as a representative of Dulin and Cowdin who were not able to attend most of the meetings of the committee due to their absence in California or Europe. Coles attended all of the meetings of the committee and kept Dulin and Cowdin informed as to the progress of the work of the committee. He passed on to the committee, as best he could, their views with respect to questions of reorganization. Cowdin only attended the first meeting of the committee and four or five meetings near the close of the proceedings. Up to the time of his death, Dulin attended but two meetings.

Coles did not file an independent petition for an allowance, but rested upon his testimony and the statement in the committee petition that "Jack Coles acted as advisor to the committee and participated in all its deliberations and activities". He will be allowed one thousand dollars ($1,000).

### Joseph Mearson Lobel.

■ Petitioner asks for an allowance of $7,500 as secretary of the Gerard committee. His services are of two kinds: (1) Research and advise; and (2) secretarial duties. He spent time studying the history and financial affairs of the debtor and its subsidiaries including the debtor's income, corporate setup, accounting practices, production and costs. Over a period of nearly three years, one-third of his time was spent in conducting correspondence, keeping the minutes and looking after the committee's finances. About 10% of his entire time was spent in matters relating to the Hastings suit. His services of the first class and in connection with the Hastings suit are obviously a duplication of services performed by other well known experts. For all helpful and appropriate services performed by petitioner he will be allowed two thousand five hundred dollars ($2,500).

### Alexander Weinstein.

■ Petitioner asks an allowance of $10,000 for services as consultant engineer for the Gerard committee. He had no experience in Public Utility Holding Company management. He made no contribution to the plan of reorganization. He testified: "I did not sit in on the plan or with the committee but I simply advised Mr. Rifkind." He was employed in December, 1935. From July, 1936, to December, 1937, he devoted all his time to an unrelated matter. The primary purpose of his employment was to advise Rifkind concerning the relative rights of security holders. His beneficial service, if any, was indirect. There was no authority to employ this accountant and to make his employment a charge against the general estate. His application will be denied.

648

In re Starrett Corporation, 3 Cir., 92 F.2d 375; In re Paramount-Publix Corporation, D.C., 12 F.Supp. 823, 835.

*Wagner, Quillinan & Rifkind.*

This law firm asks for an allowance of $80,000 and $704.76 expenses as counsel for the Gerard committee. They served the committee from the time of its organization, October 1, 1935. The major part of the services were rendered by Rifkind, a member of the firm. His services may be conveniently divided into six categories: (1) Investigation of the debtor, its assets and business, subsidiaries and affiliates, and other data which might be of assistance in formulating and considering any reorganization of the debtor and passing upon the many problems and applications to be presented from time to time in the proceeding; (2) services in appearing in the proceedings in respect of administrative matters and conferring with the debtor and its counsel, other committees and their counsel and expressing views of this committee and its counsel; (3) services in the preparation of a plan of reorganization and the examination of amendments and modifications thereof from time to time; (4) consultations with the committee members, attending meetings of the committee, preparing and revising minutes of such meetings and generally supervising routine committee functions such as correspondence, expenditures, proxy solicitation, and the like; (5) considering and advising with respect to the personnel of the new board of directors; and (6) preparing memoranda of law and fact.

Reference is made to "frequent court appearances" in Wilmington and trips to Washington to discuss matters with members of the Securities and Exchange Commission. Most of the appearances in court, however, were of a formal character, consented to by all parties, and no serious problems of litigation were carried on.

This committee asserts that at the outset it found four administrative problems to be dealt with: (1) Should the debtor be continued in possession? (2) Should interest continue to be paid on the funded date? (3) Should the company register under the Public Utility Holding Company Act of 1935? (4) Should the Delevan suit be instituted? These were current problems calling for speedy action. Except the Delevan suit, they were primarily the debtor's problems and the debtor was in the hands of very competent counsel. If the various committees considered and acted upon these problems they were necessarily duplicating the work of the debtor and its counsel.

With respect to reorganization the major problems were: (a) Extension of the October, 1935 notes; (b) provisions for sinking fund and debt retirement; and (c) provision for the control of the company.

Rifkind argued for a longer extension of the 1935 notes than was provided in the original company plan. After a discussion with Lynch and Flynn representing the debtor, and Javits, counsel for the McRoberts committee, the 10-year idea was suggested. The necessity for such extension was quite obvious. The debtor and all the committees demanded a sinking fund. Provision for a sinking fund variable with earnings rather than a fixed amount was acceptable. Additions to the sinking fund of profits on sales of assets was worked out with the McAneny committee. Rifkind participated in the negotiations resulting in the provision restricting payment of dividends. His acquaintance with the basis of the Delevan action led him with others to insist that voting control should be changed and that a majority of the board of directors should be chosen by the holders of securities senior to the common stock. He was, of course, primarily concerned with the holders of the $6 and $7 prior preference stock and negotiated in their interest. The declaration of intention on the part of the debtor to register under the Public Utility Holding Company Act was in large measure attributable to Rifkind. After the plan was confirmed he actively participated with others in phrasing the certificate of incorporation, by-laws, supplemental indenture and other papers necessary to put the plan into effect.

Doubtless there were many meetings and discussions between the various committees and their counsel with respect to the different suggestions made from time to time. Much time was spent in an examination of the Deep Rock situation and of financing problems confronting subsidiaries of the debtor, although in all these matters the debtor was represented by three capable law firms.

▮ Services to be compensated in a reorganization proceeding, however, ought to have a direct and proximate, and not

merely a remote, relation to the formulation of the plan.

■ This firm will be allowed as attorneys for the prior preference stock committee the sum of twenty thousand dollars ($20,000) and seven hundred four dollars and seventy six cents ($704.76) expenses.

Wagner, Quillinan & Rifkind also filed a petition as attorneys for Delevan Corporation and Emma A. Graham, asking for an allowance of $50,000 and $1,518.31 for expenses. They were retained to investigate the operations of the debtor prior to the filing of the 77B petition. Rifkind made a careful study of all its transactions which appeared to be fraudulent, or ultra vires. He examined the registration statement filed by the debtor with the Securities and Exchange Commission in connection with its proposed extension of the 1935 notes. He also examined the report of the investigation of the debtor in 1930 and 1931 by the Federal Trade Commission pursuant to a resolution of Congress. He also examined the complaints and the court records in the Heil and Marco stockholders' suits. It appeared to Rifkind that causes of action existed against H. M. Byllesby and Company and Ladenburg, Thalmann & Co. and certain officers and directors of the debtor. From these sources he drafted a bill of complaint on behalf of Delevan Corporation and Emma A. Graham. He frankly admitted that the complaint was strikingly similar to the Marco complaint. He testified: "There is a very substantial similarity between them." In April, 1936, Rifkind filed a petition requesting leave of this court to file the above complaint in the Supreme Court of the State of New York. The application was opposed by the debtor. Rifkind argued the matter before this court and submitted briefs. The court denied the petition and referred the questions to special counsel for the debtor to investigate and report back to the court their recommendations. Petitioners appealed from this order and Rifkind argued the matter in the court of appeals. The order was affirmed.

■ February 18, 1937, the special counsel filed their report recommending action be brought either in the name of the debtor or in the name of a trustee appointed for that purpose. Before action was brought a conditional offer of $1,000,000 was made to the debtor to compromise the proposed

action against certain of the defendants. The offer of compromise was referred to special masters to consider and report their recommendations to the court. The special masters held prolonged hearings. August 18, 1937, they filed their report recommending the rejection of the conditional offer. November 26, 1937, the court confirmed the report of the special masters and appointed Daniel O. Hastings as special trustee of the debtor to institute an appropriate action. Such an action has been brought and is pending. It is impossible to definitely appraise this chose in action. The offer of $1,000,000 was subject to a self-destroying condition which made it impossible to regard it as the equivalent of $1,000,000 in cash. Rifkind can only be compensated for the work and labor he has expended. Insofar as he copied causes of action recited in the Marco complaint his work and labor was not extensive.

■ On the entire record of Rifkind's services in this particular the court will allow to his firm the sum of ten thousand dollars ($10,000) and one thousand five hundred eighteen dollars and thirty-one cents ($1,518.31) expenses.

### Marvel, Morford, Ward & Logan.

■ This law firm has filed two petitions, one for $2,000 as local attorneys for the Gerard committee and the other for $10,000 as attorneys for the Delevan Corporation and Emma A. Graham. This firm was retained by Wagner, Quillinan & Rifkind as Delaware counsel. Their services included drafting and presenting the petition of the committee for leave to intervene and obtaining the order therefor. They advised Rifkind as to "the practice in this court in reorganization proceedings". They did not attend committee meetings. Their services covered a period of approximately three years. They will be allowed one thousand five hundred dollars ($1,500) and twenty-eight dollars and two cents ($28.02) expenses.

■ When this firm was retained as local counsel for the Gerard committee, Rifkind told Logan that he was investigating illegal conduct on the part of the officers and directors of the debtor. Logan testified that from that time Rifkind "kept us advised of the progress of his investigations and he asked particularly that I work with him on that". Thereafter Logan examined some of the documents that had been ex-

650

amined by Rifkind and his associates. Logan further testified: "Our services consisted of advising with Mr. Rifkind as to procedure to be taken so that this matter, would come before the court." The petition for leave to sue was denied. Logan did not attend the hearings before the special masters. For these services Logan's firm asks for $10,000. The basis therefor as stated by Logan is: "I was party to the creation of a fund in the form of causes of action which had been brought into court and upon which the court has placed a value of at least one million dollars." There is nothing in the record to sustain this statement. Logan can only be compensated, as was Rifkind, for the work and labor performed in connection with the Delevan complaint. For such services his firm will be allowed the sum of one thousand dollars ($1,000).

### McRoberts Committee.

September 6, 1935, Samuel McRoberts, George N. Armsby, Harold C. Richard and Hamilton Pell organized a committee for the holders of notes and debentures. October 16, 1935, this committee intervened. It represented 3,890 holders of $10,014,350 principal amount of notes and debentures. At its organization it retained Javits and Javits as its general counsel. The committee employed Seidman and Seidman as accountants. It designated Erwin W. Berry as secretary and Alfred Turner as assistant secretary. It also retained Alexander W. McCoy as valuation expert. McRoberts, chairman of the committee, requests an allowance of $25,000. The other members of the committee have each requested an allowance of $18,750. The secretary has requested $3,750 and the assistant secretary $3,000. The accountants request $17,500 plus expenses of $122.21. The valuation expert asks for $2,500. The total requests for compensation of this committee and its attorneys and agents amount to exactly $250,000 and the total expenses to $22,640.32.

The committee was organized by Pell, the owner of $75,000 of notes and debentures. He also represented customers of his brokerage house holding about $1,000,000 of notes and debentures. He enlisted McRoberts and together they selected the other two members of the committee.

This committee was the most active one in the reorganization. It represented the largest amount of equity in the debtor's estate and the greatest number of individual security holders. It represented the debtor's senior securities. Like the Gerard committee, it divided its time between consideration of a plan of reorganization and administrative duties. In performing administrative duties the committee asserts it took upon itself the functions of a board of directors or of an executive committee of the debtor. In this capacity it spent approximately half of its time in general problems of the debtor. The debtor was continued in possession and in fact was administered by its own officers and directors throughout the reorganization.

Early in the proceedings the problem arose as to whether interest should be paid on the notes and debentures during reorganization. The court ordered the payment due October 1, 1935, from which order an appeal was taken by three individual debenture holders. This committee and its counsel solved the problem of paying interest without incurring preferences. Concurrently with the payment of interest on any issue of notes and debentures, the debtor was required to deposit an amount equal to the interest accrued to the date of such payment on all other issues of notes and debentures. This procedure was approved by the debtor and other committees. The appeal by the individual debenture holders was withdrawn. Debtor had ample funds to pay interest due and accrued. The entry of an appropriate order fell to the debtor and its counsel. Consideration of this problem by committees and their counsel was wholly unnecessary.

This committee came forward within two weeks after the proceedings were instituted with definite proposals for reorganization and continued to be the principal source of the ideas and proposals which finally brought about the approved plan of reorganization. October 29, 1935, the committee adopted certain basic principles of reorganization including the following: (1) That the October, 1935, notes should be extended for ten years with a sinking fund for the notes and debentures not to exceed $2,000,000 per year payable out of 50% of the net annual earnings; (2) that the holders of notes and debentures obtain representation on the board of directors of the debtor; (3) that strict limitations be imposed upon the right to dispose of capital assets of the debtor by requiring consent thereto of the directors representing the notes and debentures and making the proceeds, unless reinvested in capital

assets, available for the retirement of the notes and debentures; (4) an annual director's audit of the debtor; (5) that any pledge or mortgage of assets by the debtor other than in the usual course of business be prohibited, unless the notes and debentures outstanding be first secured by pledge of all existing assets other than current assets.

These principles were embodied in a memorandum dated October 29, 1935. It was the basis of conferences between members of the committee and its counsel and representatives of the debtor and other protective committees and their counsel. By February 21, 1936, comprehensive proposals for a plan of reorganization were adopted by this committee and became the basis of further negotiations with the debtor and other committees. Difficulties arose respecting (a) the restrictions on the right to dispose of capital assets and the proceeds thereof; (b) the voting power of holders of notes and debentures; (c) the prohibition against mortgaging or pledging assets; and (d) the amount of the sinking fund. In May, 1936, counsel for the committee prepared an amended plan of reorganization embodying the results of all negotiations up to that time. This draft was the basis of further negotiations with the debtor and the various committees.' In July, 1936, counsel for the committee prepared a revised plan of reorganization based on the following additional principles: (a) The interest rate on notes and debentures to be materially reduced; (b) the dividend rate on the prior preference stock to be similarly reduced and the arrears eliminated; (c) that a substantial change be made with respect to the $4 cumulative preferred stock and the ' common stock. The above provisions contemplated a real reorganization. They all failed.

In September, 1936, sub-committees of the McRoberts and other committees were appointed for the purpose of coordinating the activities of both committees. October 20, 1936, both the McRoberts committee and the Gerard committee announced that they were cooperating in the development of a plan. By November, 1936, the principles of a plan began to assume the character finally incorporated in the plan of May 17, 1937.

About the time of the filing of this plan an offer of $1,000,000 was made by parties other than the Ladenburg, Thalmann & Co. interests, to settle the claims alleged in the Delevan complaint. The special masters appointed to consider the compromise reported against the acceptance of the offer of settlement.

As soon as the hearings on the million dollar offer closed the McRoberts committee undertook negotiations for further modifications of the plan of May 17, 1937. These negotiations continued through July and August, 1937, and culminated in the plan dated August 18, 1937. This plan was filed September 8, 1937, but certain provisions were objected to by the McAneny committee. Further negotiations were had from mid-September to mid-November and differences were reconciled resulting in the final plan dated November 1, 1937. This plan as modified to meet objections of the Allen committee was approved by this court.

The McRoberts committee recites the following accomplishments on its part: (1) The notes were extended for ten years; (2) limitations on new debt; (3) a sinking fund provision; (4) application of the proceeds of sales of capital assets; (5) majority of the board to be elected by security holders senior to the common stock. It should be noted that efforts to obtain a thorough reorganization of the company through (1) the reduction of the amount of bonds and debentures, (2) reduction of fixed charges of the company, (3) wiping out of all unpaid dividends on the preferred stocks, and (4) revamping and reduction of the capital structure of the company, failed. On these vital questions the committee expended a great deal of time but all were abandoned.

This committee examined into the condition of the subsidiaries of the debtor but made no contributions as a result of such examination. It undertook through its attorneys and agents a general survey of the financial condition of the debtor and of its subsidiaries. More particularly its investigations included a compilation of salaries paid to officers of the debtor and of its subsidiaries; an analysis of the dealings of the debtor and its subsidiaries with the Byllesby Engineering and Management Company and Public Utility Service and Engineering Corporation; an analysis of the operations of the debtor from 1932 to 1936; a review of the accounting practices of the debtor and of its subsidiaries; an analysis of the book value of securities of the subsidiaries as shown on the books of

the debtor and as shown on the books of the subsidiaries; and many other analyses respecting the debtor and its subsidiaries. As illustrating the extent of the ramifications of the committee's investigations, it compiled comparative statements of the weekly kilowatt hour output of electric energy of the debtor's operating subsidiaries. Compensation to committees of security holders for such labors' is not authorized by the statute.

The following amounts will be allowed the members of the McRoberts committee: Samuel McRoberts, ten thousand dollars ($10,000)'; George . N. Armsby, three thousand five hundred dollars ($3,-500); Harold C. Richard, five thousand dollars ($5,000); Hamilton Pell, .seven thousand five hundred dollars ($7,500). Expenses of the committee in the amount of twenty two thousand six hundred forty dollars and thirty-two cents ($22,640.32) will be allowed.

### Erwin W. Berry.

Petitioner was employed by the Mc-Roberts committee as secretary from September, 1935, until April 1, 1938. He had 2500 telephone conversations and half as many personal interviews with security holders. He wrote 1354 letters. As preparatory to these services he studied the data relating to the position of the debtor and its subsidiaries and the plans of reorganization. His regular salary at the bank where he was employed was not diminished during the period he was working for the committee. In view of the fact that the committee also employed an assistant secretary, Berry's application for $3,750, at the rate of $125 per month, will be reduced to two thousand two hundred fifty dollars ($2,250).

### Alexander W. McCoy.

Petitioner, a. geologist and petroleum engineer of Ponca City, Oklahoma, was employed by the McRoberts. committee to make a valuation report on properties of Deep Rock Oil Corporation and the value of the interest of the debtor in that company under its proposed plan of reorganization. Although there was no authority on the part of this committee to employ McCoy, a recognized authority in his field of work, the debtor makes no objection to his application because it was able to avail itself of his report. His application for $2,500 which includes traveling and other expenses will be allowed.

### Seidman and Seidman.

The McRoberts committee employed Seidman and Seidman, certified public accountants. They ask for an allowance of $17,500 and expenses of $122.21. They first considered from an "accounting aspect" the payment of interest. They concluded that there was sufficient income to pay the interest—a conclusion already arrived at by the debtor. Their services principally concern activities of the subsidiaries of the debtor. For instance, they considered whether the Pittsburgh Railway Company should be dropped from the Philadelphia system. They examined into the financial condition of Deep Rock and the validity of advances by the debtor to Mountain States Power Company. By arrangement with the debtor they were supplied with monthly reports prepared by the accounting department of each of the principal subsidiaries. They requested from the debtor and received weekly reports of electric output of subsidiaries. The services of these accountants were entirely unnecessary and a duplication of the work of the company's own accountants and of Haskins and Sells, independent auditors employed by the debtor, the accuracy of whose work was never questioned. There was no authority to employ this firm and charge their services to the debtor. Their application will be denied.

### Javits and Javits.

Petitioners as attorneys for the McRoberts committee ask for' an allowance of $132,500 and expenses of $3,607.73. In March, 1935, this firm as attorneys for Ralph J. Sommer, Samuel Kurzman and Jeanette Bierhoff, holders of $5,000 debentures, filed an involuntary petition against the debtor under Section 77B to which the debtor filed an answer. When the company filed its voluntary petition September 27, 1935, the creditors' petition was not further pressed.

During the period from July to October, 1935, petitioners made an analysis of the registration statement filed by the debtor with the Securities and Exchange Commission June 22, 1935, in connection with its proposed plan for a five year extension of its October, 1935, notes. They also analyzed the reports of the Federal Trade Commission.

Upon organization September 6, 1935, the. McRoberts committee retained Javits

and Javits as general counsel. They have acted as such throughout the proceeding.

October 25, 1935, Javits together with counsel for debtor appeared before this court and argued in support of the continuance of the debtor in possession. The McAneny committee opposed that continuance and insisted that a trustee be appointed. The court continued the debtor in possession.

In the order approving the voluntary petition of the debtor, the debtor was authorized to pay interest on the notes and debentures. Certain holders of debentures filed a petition seeking an order restraining the debtor from making any further payments of interest on the ground that such payments would create a preference. The court denied this petition. The debentureholders took an appeal and obtained a stay of the court's order pending a hearing in the court of appeals. Javits undertook to find a means for paying interest on all issues of notes and debentures without the creation of a preference. He suggested a practical procedure for the payment of interest due which was adopted. The debentureholders withdrew their appeal. Since December 1, 1935, this plan for payment of interest was followed.

The minutes of a meeting of the McRoberts committee held October 29, 1935, recite:

"2. The Committee determined to develop a Plan of Reorganization and in this connection a number of principles were discussed which may be summed up as follows:

"(a) To extend the notes for ten years.

"(b) To provide a sinking fund on funded debt of 50% of net earnings but not over Two million dollars per year.

"(c) To obtain representation on the Board of Directors to the extent of one-third thereof.

"(d) To provide that no assets can be sold other than in the usual course of business, mortgaged, (except to refund existing mortgages) merged or consolidated (except internal mergers or consolidation) or segregated without the approval of three-fourths of the Board of Directors.

"(e) That there should be an annual directors audit of the company available to note and debenture holders.

"(f) That the proceeds of any sale or mortgage of assets other than in the usual course of business shall be used to acquire notes and debentures by tender, purchase or retirement unless this privilege be waived by a vote of the majority of directors representing note and debenture holders.

"(g) That the right to vote be vested in any notes and debentures which are registered.

"(h) That the whole plan be based upon selling San Diego upon condition that the notes and debentures in a certain fixed amount can be acquired with the purchase price."

November 2, 1935, Javits conferred at Chicago with Lynch and Flynn respecting a plan of reorganization. He learned that the management favored a five year extension whereas the committee favored a longer period. There was difference of opinion as to the amount of the sinking fund and the extent of representation of holders of notes. November 6, he reported to the McRoberts committee a preliminary memorandum on a plan of reorganization. On the same day he conferred with attorneys for the McAneny and Kinnear committees.

December 2 petitioner conferred with counsel for the debtor respecting registration under the Public Utility Holding Company Act and respecting an injunction against the Securities and Exchange Commission. By January 3, 1936, it was clear that the Government did not intend to compel debtor to register at once. January 22 Javits with Rifkind went to Washington and had an informal conference with officials of the Securities and Exchange Commission. January 28 he attended a meeting of the committee and made a full report on the Washington conference.

February 1, 1936, Javits prepared "proposals constituting provisions for the protection of note and debenture-holders to be contained in the plan of reorganization", &c. Negotiations on a plan of reorganization with these proposals as a basis continued throughout the month of February. March 11, 1936, representatives of the committee and Javits conferred with Lynch and Flynn. The debtor's objections were: (1) That the debtor should not be deprived of the right to mortgage assets for loans maturing in less than one year; (2) that a percentage of the whole board should not be allocated to the holders of notes and debentures but that they should be represented by a specific number of directors; (3) to the method of utilizing the proceeds of sale of capital assets; (4) to

·the provision for the exchange of Standard Power and Light debentures for debentures of the debtor. These proposals were re-drafted by Javits and copies distributed.

March 2, 1936, Javits discussed with counsel for the debtor the Deep Rock situation and made an intensive study thereof. He took part in the hearing before this court October 30, 1936, on the application of the debtor for authority to assent to the plan of reorganization of Deep Rock.

During the course of the reorganization of debtor many problems affecting its subsidiaries were presented, including Wisconsin Public Service Corporation, California-Oregon Power Company, Mountain States Power Company and Northern States Power Company. In each instance Javits investigated these problems and conferred with the attorneys for the debtor. However, it is nowhere shown that his services contributed to the solution of the problems of the subsidiaries or that counsel for the debtor was in any way assisted by him.

The draft of May 11, 1936, proposed modifications to the debtor's plan for a five year extension. Counter-proposals by the debtor's management were made. Negotiations by Javits with counsel for the debtor and the committees continued through the summer of 1936. At this time the McAneny committee represented notes and debentures in a much smaller amount than the McRoberts committee. It sought to force the filing of a plan by November 1, 1936. Javits opposed the application and it was denied by the court.

After conferences with the debtor and its counsel and the Gerard committee and its counsel Javits proposed a plan of reorganization including the following: (a) The interest rate on notes and debentures to be materially reduced; (b) the dividend rate on the prior preference stock to be similarly reduced and the arrears eliminated; (c) that a substantial change be made with respect to the $4 cumulative preferred stock and the common stock. This plan was never accepted. The McRoberts and Gerard committees on October 20, 1936, announced they were cooperating in the development of a plan of reorganization. Thereafter the McRoberts committee and Javits extended their negotiations to the other committees and their counsel. May 17, 1937, the debtor filed its amended plan. This plan was concurred in by the Gerard, the Kinnear and the MacGowan committees although the MacGowan committee was not entirely satisfied with the treatment accorded the $4 cumulative preferred stock.

Javits negotiated for a further modification of the amended plan of May 17, 1937, because of dissatisfaction of holders of $4 cumulative preferred stock. Many revisions resulted. Finally the amended plan as modified, dated October 18, 1937, was filed by the debtor with its application for leave to solicit assents thereto and to bring the same on for confirmation. In this plan the prior preference stock and $4 cumulative preferred stock, were left undisturbed. These classes of stock received full voting power and full voting rights in the election of directors. The holders of notes and debentures were given the right to elect one director. The holders of the senior securities received the right to elect a majority of the whole Board. To this, objection was made by the McAneny committee. Javits, with counsel for the debtor and for the Gerard committee, immediately undertook negotiations with counsel for the McAneny committee. These negotiations continued from mid-September to mid-November, and resulted in the final plan of reorganization dated November 1, 1937. This amended plan was set for hearing February 10, 1938. Javits prepared the material for the hearing. He participated in negotiations which resulted in concurrence by the Allen committee.

After confirmation Javits participated in the drafting of the provisions of the supplemental trust agreement dealing principally with (1) retirement fund; (2) restrictions upon payment of cash dividends; (3) provisions for payments into the sinking fund; and (4) necessary definition of terms employed in connection with the foregoing. He assisted in the details for consummating the plan.

Javits' drafted ten circular letters sent out by the committee to approximately 24,000 holders of notes and debentures. He drafted the minutes of the 56 meetings of the committee.

■■■ For all services performed by petitioners they will be allowed thirty five thousand dollars ($35,000) and three thousand six hundred and seven dollars and seventy-three cents ($3,607.73) expenses.

### Stewart Lynch.

■■■ Petitioner, as local counsel for the McRoberts committee, asks an allowance of $12,500 and expenses of $180.84. He

was retained by Javits and Javits. He took part in the preparation of law on the appeal in connection with the payment of interest. His work was of an advisory and confirmatory nature with formal appearances at certain hearings. He testified:

"XQ. You were just assisting Mr. Javits? A. That is right.

"XQ. In other words matters were simply sent to you, documents and things of that sort were sent to you for your review and comment? A. I think that is the position local counsel has to take in connection with any matter, or at least I always have."

For his services Lynch will be allowed two thousand dollars ($2,000) and one hundred eighty dollars and eighty-four cents ($180.84) expenses.

### McAneny Committee.

The McAneny committee was formed in September, 1935, by John Vanneck. It represented the holders of $1,597,500 of notes and debentures. It should be noted that this is the second committee representing this class of securities. Vanneck represented securities held by himself and members of his family totaling $638,000, or 40 per cent. of the notes and debentures represented by the committee. He selected George McAneny, chairman of the board of Title Guarantee and Trust Company, holding $80,000 of debtor's securities, and LeRoy J. Weed, a trustee of Union College, the owner of $307,500 of the notes of the debtor, as the other members of the committee. McAneny was appointed chairman and Moran, secretary.

The committee requests an allowance of $12,500 and expenses of $3,479.11. Baldwin, Hutchins & Todd original counsel for this committee request an allowance of $24,000 and expenses of $270.37. They so acted until May, 1937 when Holthusen and Pinkham were retained. The latter firm asks an allowance of $20,000 and expenses of $597.29. Hugh M. Morris and Ivan Culbertson were retained October 10, 1935, as local counsel for the committee. They request an allowance of $15,000 and expenses of $159.68.

The first formal meeting of the committee was held in the latter part of September, 1935. The committee was opposed to the company plan for a five year extension of the October notes. As a result of the first meeting a letter dated October 1, 1935, was drafted and sent to all note holders known to the committee. Among other things it stated:

"This Committee, however, desires to accomplish among other things:

"1. A prompt and workable reorganization.

"2. Adequate protection for the noteholders and bondholders against the payment of dividends on stocks of the Company until provision is made for the payment of the notes and bonds.

"3. Creation of a sinking fund or other provision for the payment of the notes and bonds at maturity.

"4. Representation on the Board of Directors for the noteholders and bondholders."

Concerning this letter Todd, counsel for the committee, testified: "I believe your Honor will bear me out, that the plan as adopted does include in substance the objectives as they are stated and arrived at by this committee at their first meeting."

October 25, 1935, at a hearing on the question whether the debtor should be continued in possession this committee opposed such continuance and urged the appointment of trustees. Their objection was overruled.

The next question considered by the committee was the payment of interest. After Javits suggested the procedure for the deposit of interest this committee went along and favored interest payments.

November 18, 1935, this committee was granted leave to intervene. Thereafter negotiations commenced regarding terms and provisions of a plan of reorganization. During the balance of 1935 and the early part of 1936 there were numerous conferences with other committees and their counsel as well as with the debtor and its counsel. Early in 1936 a deadlock arose and this committee was more or less excluded from conferences with the McRoberts and Gerard committees. In November, 1936, the committee requested the court to fix a date when a plan should be proposed. This request was opposed by other interests and denied. In March, 1937, a draft of an amended plan was circulated generally. The McAneny committee opposed this plan although it was acceptable to all the other committees except the Allen committee. The grounds of opposition of the Allen committee were: (1) No provision was made for the pledge of securities with an independent trustee; (2)

656

there was no restriction on dividends; (3) there was only contingent representation by the noteholders on the board of directors; and (4) the sinking fund provision was inadequate.

April 14, 1937, the offer of settlement of the Delevan action was made. The committee determined that legal advice upon the adequacy of the offer of settlement was necessary. Todd, being preoccupied in public service in New York, the committee employed Holthusen and Pinkham. May 13, 1937, Pinkham reported that the offer of settlement was inadequate and the conditions improper. Thereafter Vanneck testified before the special masters in opposition to the acceptance of the offer of settlement.

May 17, 1937, an amended plan was circulated. In connection with that plan Pinkham testified. "Our committee felt it had been more or less excluded for whatever reason may be, from the conferences of the other groups, and the plan had been prepared more or less without consultation with them."

In the negotiations between May and October this committee claims credit for the following contributions: (a) A change in the phraseology of the negative pledge clause; (b) restriction on the payment of dividends; (c) an increase in the sinking fund; (d) acquisition of a directorship; (e) the provision in the plan retaining the court's jurisdiction over the Delevan suit; and (f) assistance in the work on the supplemental indenture. These changes were all embodied in the plan of November 1, 1937, which plan was finally approved by the court with some further modifications March 5, 1938.

■ This committee will be allowed for their services six thousand dollars ($6,000) compensation and three thousand four hundred seventy-nine dollars and eleven cents ($3,479.11) expenses.

*Baldwin, Todd and Young.*

These attorneys for the McAneny committee petition for an allowance of $24,000 and $270.37 for expenses. They were retained September 16, 1935. At the outset Todd engaged in a series of conferences with representatives of two other committees and counsel for the debtor. The object of the conferences was to work out a plan of reorganization. From time to time he reported to his committee "until the committee became impatient because we

did not seem to be accomplishing a result". In April or May, 1936, Todd filed a petition requesting that certain provisions be added to the plan originally promulgated by the debtor. This was denied. After that the conferences were continued and "again came to a condition where no progress seemed to be made". In October, 1936, Todd presented another petition praying for an order directing the company to file a plan. This also was denied. Todd continued conferences with counsel for other committees concerning a plan then in progress of formulation. A plan was completed May 17, 1937. Todd studied the plan, and his committee opposed its adoption.

About this time Pinkham was retained to represent the committee at the hearings before the special masters with respect to the Delevan complaint. Todd admits that he had nothing to do with the development of the plan after May 7, 1937, although he did confer with Pinkham from time to time.

■ Petitioners will be allowed three thousand five hundred dollars ($3,500) compensation and two hundred seventy dollars and thirty-seven cents ($270.37) expenses.

*Holthusen and Pinkham.*

Petitioners were employed by the McAneny committee in May, 1937, to represent it before the special masters. Pinkham's services followed the report of the special counsel respecting the Delevan claim. He opposed the offer of settlement. He participated in the hearings before the special masters and submitted briefs. He suggested to the special masters that the plan of reorganization should contain a provision whereby the court would retain jurisdiction over the Delevan complaint and appoint a trustee for the prosecution thereof. Pinkham testified that approximately one-third of his time was devoted to the Delevan matter, about fifty percent to negotiations in connection with a plan of reorganization and the balance in work on the indenture.

Pinkham entered the negotiations for a plan about May 7, 1937, when a draft was circulated among counsel. As a result of his negotiations the negative pledge clause in the plan of May 17, 1937, was revised. He contended that the provision in the sinking fund clause with respect to the disposition of the proceeds from the sale of capital assets originated with his committee and that the entire provision "5" with respect to the net gain from the sales of capi-

tal assets arose from his negotiations with the committees. After the plan was confirmed he attended a number of conferences and participated in the drafting and redrafting of various provisions in the indentures. Such services were obviously a duplication of the efforts of others upon whom the responsibility for that work primarily fell.

Petitioners will be allowed five thousand dollars ($5,000) compensation and five hundred ninety-seven dollars and twenty-nine cents ($597.29) expenses.

### Hugh M. Morris and Ivan Culbertson.

Petitioners were employed October 10, 1935, as local counsel for the McAneny committee. They ask for an allowance of $15,000 and expenses of $169.58. Before being employed by this committee Culbertson was employed by three creditors previously represented by Javits to oppose the payment of interest. This application was denied and an appeal was taken to the court of appeals and a stay obtained. Javits having initiated and worked out a procedure for paying interest Culbertson was content. The court of appeals vacated the stay and dismissed the appeal. Culbertson estimated that about one-fourth of the time which he devoted to this case was spent in connection with the interest matter. It is difficult to find any benefit to the debtor or its security holders in the above effort.

With respect to the services rendered to the McAneny committee Culbertson testified he had conferences with this committee and its counsel and performed the service which customarily falls to local counsel. He testified that Judge Morris did not appear in court nor negotiate with any of the members of the other committees but consulted with Culbertson and Todd. Regarding the plan of reorganization Culbertson testified:

" XQ. Did you have anything to do with the drafting of the plan or the trust indenture? A. I did not."

For their services petitioners will be allowed two thousand five hundred dollars ($2,500) compensation, and one hundred sixty-nine dollars and fifty-eight cents ($169.58) expenses.

### Kinnear Committee.

August 1, 1935, the Kinnear committee was organized by Asa B. Kellogg of the law firm of Nevius, Brett and Kellogg. The committee retained this firm and Raymond L. Wise as counsel. It represented less than $400,000 of the October, 1935, notes. It did not represent any other securities. This class of securities was also represented by the McAneny and McRoberts committees. W. S. Kinnear was chairman. He had been an invalid for over a year and did not appear at the hearing on allowances. The other members of the committee were Frost Haviland, Samuel Wieder and Albert C. Lord. The committee asks for $15,000 and $680.68 expenses. It employed David Berdon and Co. as accountants. They ask for $1,500.

September 20, 1935, the committee sent a letter to noteholders criticising the voluntary plan of the debtor and suggesting the following basic ideas as appropriate in a plan of reorganization: (a) An extension of the 1935 notes provided certain safeguards were thrown around such extension; (b) provision for a sinking fund; (c) provision restricting the payment of dividends; (d) provision as to the mortgage of assets; and (e) limitation upon the control and management. In November, 1935, these ideas were embodied in a memorandum which was distributed to the members of the other committees and their counsel.

Thereafter the various committees met many times for the purpose of consolidating and clarifying the method of carrying out "what all of the committees had practically agreed on in the first few meetings". Kellogg testified: "There was practical unanimity as to the restrictions that should be put on the company, but as to what form those restrictions should take was the matter of consultation and dispute during those seven months." There was inactivity from November, 1936, until March, 1937, when the first draft of a plan was distributed to counsel for the committees. The Kinnear committee objected to this plan and demanded that the proposed security features of the new debentures be given to unconverted notes and debentures. This was conceded and contained in a new draft of April, 1937. The provision for convertible notes was later abandoned.

About this time the offer of settlement of the Delevan action was brought to the attention of this committee. A member of the committee, with its approval, testified before the special masters in favor of acceptance of the offer.

Further modifications resulted in the amended plan of May 17, 1937, which was filed in court. This plan was acceptable to the Kinnear committee except as to the provisions restricting the payment of divi-

dends. Such restrictions were included in the plan of October 1, 1937, and met with the approval of the committee. Although these provisions were drafted by counsel for the McAneny committee they embodied proposals which had been advocated by the Kinnear committee from the beginning. With slight modifications the plan of November 1, 1937, was confirmed by the court.

■ This committee will be allowed five thousand dollars ($5,000) compensation and six hundred eighty dollars and sixty-eight cents ($680.68) expenses.

### David Berdon & Co.

■ These accountants were employed by the Kinnear committee. They petition for an allowance of $1500. They were requested by the committee to do two things: (1) Prepare a summary or digest of the information available in the published data in regard to the debtor in a form usable by the committee and its counsel; and (2) pass upon the proposals the committee had in mind from the standpoint of accountants. They commenced their work about August 21, 1935, and submitted their report to the committee and its counsel September 25, 1935. All this was before the institution of these reorganization proceedings. Their application will be disallowed.

### Nevius, Brett & Kellogg and Raymond L. Wise.

Petitioners as attorneys for the Kinnear Committee ask an allowance of $40,000 and $227.26 for expenses. They were employed about the time of the organization of the committee in October, 1935. Between July and October, 1935, petitioners devoted some time to the financial structure of the debtor and its voluntary extension agreement. Wise made some suggestions to the debtor in August or September. These were followed up by the letter of the Kinnear committee prepared by its counsel and dated September 20, 1935. Petitioners cooperated in solving the problem of paying interest. They opposed the appointment of a trustee. They prepared a short memorandum dated "Oct.-Nov.-1935" setting forth seven points which they felt should be in a plan of reorganization. It may be noted that all of these points with the exception of one were included in the final plan. Numerous discussions were had with counsel for the debtor and for other committees from March 31, 1936, until the draft of April 20 came out. This plan was substantially sat-

isfactory to petitioners with the exception of the provisions with respect to the restriction on the payment of dividends. These provisions were later modified to meet the views of petitioners and were included in the final plan. Wise and Kellogg both participated in the hearings on the plan. After the plan was confirmed petitioners assisted in drafting the certificate of incorporation and supplemental indenture. As to the Delevan action, Wise testified: "We make very little charge for our participation in the Delevan suit. I came down here and testified before the special masters pursuant to authority given me by the committee to express their views and suggested that the settlement should be accepted."

■ Petitioners will be allowed seven thousand five hundred dollars ($7,500) compensation and two hundred twenty-seven dollars and twenty-six cents ($227.26) expenses.

### William T. Knowles.

■ Petitioner as local counsel for the Kinnear committee asks for an allowance of five hundred dollars ($500). This request is reasonable and will be allowed.

### Allen Committee.

This committee was not formed until June 5, 1936. It represented the $4 cumulative preferred stock. It consisted of Benjamin L. Allen, James S. Cobb, Carrol S. Loeb, Frank S. Shaw, Harry J. Taylor and Bernard S. Van Rensselaer. They ask for an allowance of $15,000 and expenses of $1,222.62. The committee employed William M. Chadbourne as counsel and John Holbrook, one of his assistants, as secretary. The committee represented approximately 146,085 shares out of 757,442 shares outstanding.

The committee held ten formal meetings at which minutes were kept and seventeen more or less informal. It consistently opposed every plan that was presented and never prepared a plan of its own. Summarizing, this committee opposed the provisions of the March, 1937, plan providing for the giving of three shares of common stock for each share of preferred together with accumulated dividends. They objected to the April, 1937, draft which provided that they should receive common and a new non-cumulative preferred stock. They objected to the May, 1937, plan containing a conversion privilege. They objected to the August, 1937, plan because it did not enable the $4 preferred stockholders to vote as a

class. They objected to the offer of settlement of the Delevan claim. Loeb testified that he devoted a great deal of time studying the financial structure of the debtor and its various affiliated companies. At the direction of the committee he made a study of the Deep Rock situation but virtually admitted that his services did not confer any benefit upon the estate. In addition to attending committee meetings and conferences Van Rensselaer assisted Chadbourne in January, 1938, in the preparation of the case in opposition to the November, 1937, plan. For these services he was paid by Chadbourne $500 as he "did not consider that was part of the committee work". The $4 preferred stock was in precisely the same position after the reorganization as it was before except that it had the right to elect two of the nine members of the board of directors.

This committee will be allowed five thousand dollars ($5,000) compensation and one thousand two hundred twenty-two dollars and sixty-two cents ($1,222.62) expenses.

### William M. Chadbourne.

Petitioner as attorney for the Allen committee asks an allowance of $50,000 and $2,334.57 for expenses. He was retained as counsel by this committee June 5, 1936. Upon his application the committee was granted leave to intervene June 15, 1936. Van Siclen, an associate of Chadbourne, testified at length as to the services rendered by himself and Chadbourne. Like counsel for the other committees petitioner consented to the payment of interest by the debtor. After research and investigation of the debtor, petitioner drafted for the committee a letter dated August 11, 1936. In October, 1936, petitioner appeared before the court and acquiesced in the acceptance of the offer of compromise of the claim of the debtor against Deep Rock. Petitioner considered the control of the company through the common stock.

In February, 1937, the special counsel for the debtor filed their report in respect to the Delevan complaint finding that certain causes of action should be prosecuted. Petitioner devoted considerable time to this matter. Thereafter when the offer of settlement was made and referred to special masters petitioner appeared before them and joined with counsel for the McAneny committee in objecting to the acceptance of the offer. Petitioner prepared briefs on the law and facts. The offer was rejected. Peti-

tioner also gave consideration to problems involving the Northern States Power Company and the Mountain States Power Company, two subsidiaries of the debtor. On or about March 9, 1937, petitioner received a copy of a proposed amended plan prepared by the debtor in collaboration with the committees. Petitioner objected to the provisions respecting the $4 cumulative preferred stock and the provisions for a sinking fund. After discussions, further amended plans were submitted to petitioner dated April 20, 1937, and May 7, 1937. Each of these were found to still contain objectionable provisions. May 18, 1937, debtor filed in court its amended plan. The provisions of this plan respecting the $4 preferred stock, the option to note and debenture holders and the sinking fund, were in substance the same as in the previous drafts. May 28, 1937, petitioner prepared and sent to the $4 preferred stockholders a letter embodying the principal objections to the proposed amended plan. August 18, 1937, debtor further amended the plan but it was still unsatisfactory to the Allen committee. November 1, 1937, debtor filed its further amended plan and in connection therewith a proposed "agreement" giving to note and debenture holders an opportunity to exchange their securities. Although the plan had been changed in many respects to meet the objections of petitioner it was still unacceptable to the committee and petitioner opposed its approval. A hearing was set for February 10, 1938. Petitioner prepared and sent out a letter dated January 12, 1938, setting out its objections. These were failure to give adequate representation to the $4 cumulative preferred stock on the board of directors and objections to the sinking fund provision. The court indicated that the "agreement" would not be approved. Its elimination was not due to the efforts of this committee. Aside from this committee and Garlock, who represented a very small interest, none of the other committees or other counsel objected to the amended plan. After the hearing had been concluded further conferences were held with counsel for this committee, for the other committees, and for the debtor and all objections to the plan were disposed of. This amended plan was approved. Although petitioner resisted to the end the sinking fund provisions he claims credit for improving the wording of the accepted provision.

Petitioner will be allowed seven thousand five hundred dollars ($7,500) com-

pensation and two thousand three hundred thirty-four dollars and fifty-seven cents ($2,334.57) expenses.

## Leonard G. Hagnar.

■ Petitioner as local counsel for the Allen committee asks for an allowance of $2,500 and $26.20 expenses. For his services as local counsel he will be allowed one thousand dollars ($1,000) and twenty-six dollars and twenty cents ($26.20) expenses.

## MacGowan Committee.

This committee was formed in the latter part of June, 1936, by John K. Mac-Gowan at the instance of some of the larger holders of the $4 cumulative preferred stock. This is the second committee representing this class of stock. The other members were James Bruce, Frederick E. Hasler and Joseph H. McMullen. The original meeting was held July 27, 1936. Battle, Fowler and Neaman, and Miller, Otis and Bailey were selected as counsel. The committee is asking for $12,000 and $3,984.29 for expenses. MacGowan was the only member of the committee who appeared and testified at the hearing on allowances. July 31, 1936, the committee, by advertisement and direct communication, solicited authority to represent this class of security holders of the debtor. They represented about 150,000 shares. August 21, 1936, the committee petitioned for leave to intervene on behalf of the $4 cumulative preferred stock. The application was denied, as leave had theretofore been granted to the Allen committee representing the same class of securities. However, the court granted the committee leave to solicit proxies and suggested that the two committees consolidate their efforts. The committee had only six meetings. From August, 1936, to March, 1937, nothing was presented to this committee by the committees for the senior securities. In March, 1937, it received copies of a draft of an amended plan. This plan was not satisfactory to the committee. Thereafter, the committee had many conferences with members of the Allen committee and urged the importance of getting some plan before the court. The Allen committee thought it advisable to oppose all plans until a satisfactory one was presented. It became evident that the views of the two committees were diametrically opposed. Thereafter, each committee followed its own course. Various proposals were submitted to the MacGowan committee,

all of which contemplated the elimination of the cumulative dividends on the $4 preferred stock. The principal contribution of the MacGowan committee to the plan, like the Allen committee, was retaining the $4 cumulative preferred stock in the same position as before reorganization and securing for it representation on the board of directors.

■ The committee will be allowed four thousand dollars ($4,000) compensation and three thousand nine hundred eighty-four dollars and twenty-nine cents ($3,984.29) expenses.

## Battle, Fowler and Neaman.

Petitioners as attorneys for the Mac-Gowan committee ask for an allowance of $40,000 and $1,041.96 for expenses. This firm was employed in July, 1936. Associate counsel in New York are not asking for an allowance. After studying the proceedings, petitioners prepared a letter dated August 1, 1936, which was sent to the $4 cumulative preferred stockholders. August 21, 1936, petitioners prepared a petition for leave to intervene, which was denied. From July, 1936, to March, 1937, no active negotiations were taken up with the debtor or with counsel for the other committees. Petitioners "kept track of the negotiations that were going on." March 4, 1937, petitioners attended a meeting in New York with counsel for all of the other committees and for the debtor. A draft of a plan was submitted for discussion. This draft with some changes was afterwards filed in court May 17, 1937. Prolonged negotiations were entered into by petitioners and the MacGowan committee in an effort to obtain more favorable terms for the $4 preferred stock. Battle testified that he made every effort to get together with the Allen committee which took the position that it would "oppose every plan until they got something that was entirely satisfactory." When the May 17, 1937, plan was proposed petitioners concluded that they would consent "to make progress". The Allen committee objected. In August, 1937, an amended plan was filed in which the "disadvantageous provisions" relative to the $4 preferred stock were largely eliminated. Later, the November plan was filed and agreed to by all of the committees except the Allen committee. Fowler testified that his firm "did not have anything to do with the detailed draft of the final plan". Peti-

tioners attended the hearings on the plan. Following its confirmation they attended many conferences relating to the drafting and redrafting of the necessary closing papers. With respect to the latter work, Fowler testified "Mr. Flynn did all of the major part of that work but he attended a number of conferences in connection therewith."

■ Petitioners will be allowed five thousand dollars ($5,000) compensation and one thousand forty-one dollars and ninety-six cents ($1,041.96) expenses.

### Hering, Morris, James and Hitchens.

■ Petitioners were local counsel for the MacGowan committee. They ask for an allowance of $2,000 and $27.39 expenses. Morris performed the usual services of local counsel. He did not attend any of the committee meetings nor participate in the drafting of the plan. For their services as local counsel this firm will be allowed one thousand dollars ($1,000) and twenty-seven dollars and thirty-nine cents ($27.39) expenses.

### Seibert and Riggs.

■ Petitioners as attorneys for Standard Power and Light Corporation petition for an allowance of $2,500 and $131.74 for expenses. Their client was the owner of a majority of outstanding common stock of the debtor. In January, 1938, Riggs examined the amended plan of reorganization dated November 1, 1937, and attended the final hearings in February, 1938. A member of the firm testified that he examined the amendments to the charter, by-laws and supplemental indenture "to see that nothing crept in that was inimical to the interest" of his client. This firm contributed nothing to the plan of reorganization. They served their client. They are not entitled to any allowance from the debtor for services or disbursements.

### Archibald Palmer and Benjamin A. Hartstein.

■ Petitioners filed an application for an allowance of $17,500 and $757.81 expenses "as attorneys for bondholders and creditors of the above-named debtor and for intervening, answering bondholders to the voluntary petition of the debtor". Accountants employed by them petition for an allowance of $3,500 and $270 expenses.

Palmer as attorney for Jacob H. Adler, Millie Oppenheimer and David Schlein, owners of $7,000 of debentures of the debtor due in 1951 and 1966, filed an answer to the debtor's petition denying the allegations thereof and asking that the same be dismissed. After hearing, the court denied the motion to dismiss. Palmer also filed a petition on behalf of these same creditors for leave to intervene in the involuntary proceeding. Leave was denied and the order of denial affirmed by the court of appeals.

After these unsuccessful efforts, Palmer appeared before the special masters and urged the acceptance of the offer of settlement of the Delevan action. He attended the hearings on the plan and was permitted to cross-examine. It should be noted that these petitioners represented holders of debentures due in 1951 and 1966. At no time during the proceedings was there a suggestion that the rights of the holders of these debentures would be adversely affected by any of the proposed plans of reorganization. In no respect were petitioners' services helpful or beneficial to the estate. Their application will be denied.

■ Employment of Feinberg and Jacobs was not authorized nor was their work of any value to the estate. Their principal effort consisted in analyzing the reports of Haskins and Sells. Their application will be denied.

### Edward M. Garlock.

■ Petitioner as attorney for H. E. Horwood, owner of sixty shares of common stock and Marguerite Lee, beneficial owner of four hundred shares of common stock of the debtor, petitions for an allowance of $25,000 and expenses of $430.81. He divides his services into two classes: (1) Services in relation to the Delevan complaint, and (2) services in relation to the plan. He testified that at the request of his client he examined a report of the Federal Trade Commission and the papers on file in court in the Marco, Heil and Skillman actions and concluded that there were causes of action "of a very substantial character". Horwood instructed Garlock to bring the facts to the attention of a court. He examined the question whether or not an application should be made to this court for leave to bring an action against the debtor and its former officers and concluded that such an application

662

should be made. Before completing a petition for leave to sue and a complaint he learned, as he testified, "very much to my chagrin the Delevan Corporation and Emma Graham filed their petition in advance of mine". Thereupon Garlock communicated with Rifkind and obtained and examined the Delevan complaint. He offered his services to Rifkind in connection with the further prosecution of the Delevan proposed action "but our discussions were not fruitful". He then turned his attention to this proceeding. April 21, 1937, the special masters fixed May 1, 1937, for the first hearing. Garlock testified that he appeared before the special masters and took what he "considered an important, active part in the proceedings with respect to opposition to the acceptance of the offer". Acceptance of the offer was objected to by the McAneny and Allen committees. There is conflict in ·the testimony as to which of the objectors assumed the burden. Pinkham testified: "I think it is fair to state that as that proceeding developed before the Special Masters, the lead on behalf of the proponents of the offer was taken by Mr. Webster, and the opposition lead taken by myself, although during the entire matter Mr. Garlock assisted, and I counselled with him during the course of it." Briefs were submitted to the special masters by all three objectors. The offer was rejected.

Whatever services were rendered by Garlock with respect to the offer of settlement were mere duplications of the work of attorneys for the McAneny and Allen committees.

After the offer of settlement was rejected, Garlock performed no other service until the draft of the final plan was circulated in the latter part of 1937. He took no part in the formulation or drafting of the plan. He states his inactivity was "because he had seen and heard enough of the protracted wrangling among the several committees to conclude that any services which the terms of the plan might require would be rendered by him much more effectively at hearings on the plan than by participation in those negotiations". He did appear at the hearings on the plan and cross-examined witnesses. His objections are well summarized: "I thought that the plan was drawn with less precision and clarity than it might have been." To cure these defects he made numerous suggestions as to change of language but added little of substance. After the plan was confirmed, he submitted to counsel for the debtor and for the.several committees a memorandum of "omissions and ambiguities" and pointed out particularly the absence of "technique" with respect to carrying out certain provisions of the plan. Most of his suggestions were rejected. Garlock testified: "I have a high regard for Mr. Flynn [counsel for debtor] whom I consider one of the ablest draftsmen that I ever met, and it is probably true that Mr. ' Flynn would have thought of these things himself." It is obvious that the services rendered by Garlock were duplications of efforts of counsel for the debtor, for the indenture trustee and others upon whom the primary responsibility for this work rested.

"* * * it is too plain to render exposition necessary, that the allowance of compensation to every attorney who, representing an infinitesimal interest in a pending matter, chooses to inject himself into hearings and matters, without authority or contract, and where such matters are already being given attention by attorneys whose plain duty it is to look after them, would have the effect to parcel out the debtor's assets, among the attorneys for creditors and stockholders, without even the formality of casting lots, as even the Roman soldiers did at Golgotha". West v. Fradenburg, Webb, Beber, Klutznick & Kelley, 8 Cir., 86 F.2d 318, 320.

No allowance can be made to Garlock.
*Maurice Kozinn.*

 Petitioner as attorney for a single preferred stockholder asks an allowance of $500 and expenses of $27.85. His contribution was an appearance before the special masters to enter an objection to the acceptance of the offer of settlement. His application will.be disallowed.

*Special Counsel and Special Masters.*

William H. Button and William G. Mahaffy were appointed by order of this court special counsel to examine.into the questions presented by the Delevan and Graham petition and the complaint which Rifkind had annexed thereto. The special counsel began their services on May 9, 1936. They submitted their report on February 18, 1937. Their efforts bore fruit in the Hastings action. In their report they rendered their opinion after examining numerous documents and having conferences with the debtor and Rifkind. The report recommended the bringing of suit.

In April, 1937, some of the defendants with other persons interested in an early reorganization of the debtor offered to pay $1,000,000 in settlement of their liability, if any, in the proposed action. The offer was conditioned, among other things, upon the confirmation prior to January 1, 1938, of a plan of reorganization of the debtor satisfactory to Standard Power and Light Corporation. The special counsel were appointed by order of this court special masters to pass upon the offer. After protracted hearings and consideration of nearly 1,000 pages of testimony and very numerous and voluminous documents the special masters recommended rejection of the proposed settlement on two grounds: (1) The character of the conditions attached to the offer; and (2) the inadequacy of the offer.

■ Special counsel and special masters are not concerned with the benefit of their services to the estate. They are direct judicial appointees. As officers of the court they are entitled to payment in any event. As to duplication, Button testified: "Any work that had been done by any of these parties on the matter was of a different character and had been finished long before we took it up. Not one of them was commissioned to do any of the work that we were commissioned to do. * * * I would therefore say that there could not have been any duplication of work in that regard."

The hearings before the special masters commenced on May 20 and continued from that time until August 18, 1937, when their report was filed. Button spent over half of his time on the work. Mahaffy supplemented Button's testimony and estimated that 65% to 70% of his time during the nine months and nine days as special counsel was devoted to the case and about 90% of his time during the four months and eleven days as special master was spent in connection with his duties as such.

■ Petitioners both as special counsel and special masters will be allowed a total compensation of forty thousand dollars ($40,000) and three thousand one hundred fifty-seven dollars and one cent ($3,157.01) expenses.

### Trustees and Depositaries.

Seven banking institutions claim allowances for services as depositaries. Two others claim allowances for services as trustees, and one of these two for services as paying agent.

The charges of the depositaries vary although the services are substantially the same. In summary they are: (1) Acceptance of notes for deposit; (2) issuance of certificates of deposit; (3) custody of securities; (4) maintenance of accounts; (5) interest payments to holders of certificates of deposit, including preparation of lists and ownership certificates, detaching coupons, stamping of legend on notes indicating payment of interest and taking securities from vault to printer, checking and returning same to vault; (6) certifications to Guaranty Trust Company of New York, trustee; and (7) sundry services. The services in connection with the consummation of the plan include: (1) Mailing of notices of exchange; (2) attaching coupons to extended notes; (3) preparing lists of exchanges; and (4) taking up outstanding certificates and returning notes.

■ Certain principles governing allowances to depositaries and trustees in 77B proceedings are now well settled. Courts are not bound by any fixed scale employed by banking institutions or formulæ adopted by fiduciary associations. Though recognizing that care must be devoted to this class of service, its routine character should not be overlooked. In re Paramount-Publix Corporation, D.C., 12 F.Supp. 823, 832; In re Alleghany Corporation, D.C., 16 F.Supp. 75, 79. Nor is the approval of local standard rates to be taken as an acceptance of their reasonableness in all cases. When the number of securities serviced is large adherence to local rates may not be justified. In re United Railways & Electric Co. of Baltimore, D. C., 15 F.Supp. 195, 202. A flat rate for each security received or paper of the same kind handled "may be entirely reasonable when applied to a small or average volume of securities, but may be quite excessive when applied to such a large volume as was handled in this case". In re Alleghany Corporation, D.C., 16 F.Supp. 75, 78. The great variation between the claims for allowances by banking institutions in this case is strong evidence of the lack of satisfactory data in fixing proper and reasonable charges. Excessive per diem charges by salaried officers of depositaries and trustees over and above their necessary and reasonable expenses

664

of travel and subsistence in attending court as witnesses should not be allowed.

The following maximum charges for certain services by depositaries will be approved:

Acceptance of notes for deposit, 50 cents per item.

Issuance of certificates of deposit, 50 cents per item.

Custody of notes, $\frac{1}{40}$ of 1% of principal amount.

Maintenance of individual accounts, 35 cents per annum per account.

Other items of service by certain of the depositaries will receive separate consideration.

### Old Colony Trust Company of Boston.

■ At the hearing the charge for services of its vice president in attending the hearing on the plan was voluntarily reduced from $150 to $90. Petitioner will be allowed two thousand five hundred seventy-one dollars and thirteen cents ($2,571.13) compensation and five hundred seventy-eight dollars and thirty cents ($578.30) expenses.

### Chase National Bank of New York.

The charge for maintenance of individual accounts is reduced to $2,316.30. The charge for services in connection with the endorsement of legend on notes evidencing interest payments is reduced to $1,000 in view of the full allowance of out-of-pocket expenses in connection therewith. For like reason the charge of $1,500 for endorsement of the extension legend and affixing coupons is reduced to $1,000. The item of $3,209.30 for miscellaneous services including administrative supervision is not based on costs but is an approximation. As an allowance for many of the separate items entering into the miscellaneous services has been made this item is reduced to $1,000. The item of $3,292.80 for services rendered after July 30, 1938, and to be rendered is reduced to $2,500.

■ Petitioner will be allowed twenty-six thousand four hundred sixty-four dollars and twenty cents ($26,464.20) as compensation, and four thousand one hundred ninety-four dollars and nineteen cents ($4,194.19) expenses.

### Fidelity-Philadelphia Trust Co.

■ The item of $1,202 in connection with imprinting legend with respect to ex-tension of notes is reduced to $500. The charge of $100 for attendance of an officer as a witness before the court will be reduced to $50. Petitioner will be allowed five thousand five hundred twenty-nine dollars and thirty-four cents ($5,529.34) and seven hundred seven dollars and thirty-seven cents ($707.37) expenses.

### North Western National Bank and Trust Company of Minneapolis.

■ The item of $250 for endorsing interest payment on notes and the item of $694.50 for endorsing legend as to extension of maturity will be reduced to $125 and $250 respectively. The charge of $200 for attendance of an officer as a witness will be reduced to $100. Petitioner will be allowed two thousand one hundred seventy-seven dollars and fifty cents ($2,177.50) and one hundred seventy-six dollars and forty cents ($176.40) expenses.

### Continental Illinois National Bank and Trust Company of Chicago, as Depositary.

■ The charge for acceptance of notes for deposit will be reduced to $245. The charges of $1,669.45 and $828.75 will be reduced to $1,000 and $500 respectively for the reasons stated in considering corresponding items in the Chase Bank application. The item of $242.50 will be reduced to $48.50. The item of $69.25 for "change of addresses of depositors" will be disallowed.

Petitioner will be allowed eighteen thousand seven hundred fifty-four dollars and eighty-one cents ($18,754.81) compensation, and three thousand four dollars and fifty-five cents ($3,004.55) expenses. Petitioner has on deposit seven thousand eight hundred twenty-four dollars and eighteen cents ($7,824.18).

### Bank of America National Trust and Savings Association, San Francisco, California.

■ The item of $12 for acceptance of notes is reduced to $6. The item of $17 for investigation and approval of deposits by fiduciaries and corporations, and the item of $7.50 for cancelling certain certificates of deposit are disallowed. The item of $500 based upon a $50 per diem charge for services of an officer of the petitioner in attending court is reduced to $250. The item of $247.51 being a charge

of 12½ per cent on the aggregate of fees will be disallowed.

Petitioner will be allowed two thousand five hundred fifty-six dollars and eleven cents ($2,556.11) and eight hundred two dollars and forty-nine cents ($802.49) expenses.

### Bank of America National Trust and Savings Association, Los Angeles, California.

The items of $18 and $8 for acceptance of notes will be reduced to $9 and $4 respectively. The item of $397.63 being a charge of 12½ per cent on the aggregate of fees will be disallowed. The item of $500 based upon a $50 per diem charge for an officer of the petitioner attending the hearing will be reduced to $250.

▮ Petitioner will be allowed the sum of three thousand four hundred eighteen dollars and eight cents ($3,418.08) compensation, and four hundred seventy-seven dollars and three cents ($477.03) expenses.

### Guaranty Trust Company of New York as Trustee and Paying Agent.

Petitioner asks for an allowance of $40,550 for services and $793.50 for expenses. Services may be divided into (a) general services as trustee other than services in connection with the extension of notes, $4,000; (b) services in connection with the extension of the two note issues, $9,750; and (c) services in making five semiannual interest payments on the two overdue note issues, $26,800. In addition, counsel for the trustee asks for an allowance of $3,000 compensation and $41.91 expenses.

Services as trustee included an examination of the papers instituting this proceeding; preparation and filing of three proofs of claim; examination of reorganization plans; examination and revision in draft form of supplemental trust agreement; answering inquiries of note and debenture-holders; and conferences with counsel. In view of the application of counsel respecting these matters the allowance to the trustee will be reduced to $2,000 and the allowance to counsel to $1,500.

Services in connection with the two note issues involved receiving the notes from the holders, making of records, the endorsement of each note with an extension legend, obtaining the coupon sheets from the banknote company and attaching them, and then returning the notes to the holders. Services in making the semi-annual interest payments on the two overdue note issues involved receiving the notes from the holders, affixing legend of the extension of the notes, drawing the check for the interest and giving the check and the notes back to the holders. This was known as a security operation. There was involved the handling of 53,200 pieces, in par value a little less than $40,000,000. In view of the services performed and the volume handled the allowances sought appear fair and reasonable.

▮ Petitioner will be allowed thirty-eight thousand five hundred and fifty dollars ($38,550) as compensation and seven hundred ninety-three dollars and fifty cents ($793.50) expenses and the further sum of one thousand five hundred dollars ($1,500) as compensation for its counsel and forty-one dollars and ninety-one cents ($41.91) expenses of counsel.

### Continental National Bank and Trust Company of Chicago as Trustee.

This bank has filed an application for an allowance of $3,175.46 for services as trustee and $13.38 expenses. The maintenance fee as trustee is on an annual basis of $750 per year and was arrived at by agreement with the debtor. Included in the total amount requested is the sum of $2,500. As to it, Mr. Claussen testified on direct examination: "For that service, including the service of counsel in connection with those proceedings, involving the supplemental indenture, we are asking for the sum of $2,500, to absorb the attorney's fees." However, on cross-examination it developed that office counsel on yearly salary at the bank acted as counsel in this matter and that the charge of $2,500 "was decided upon by our vice president in charge * * * and he determined in his opinion what this charge should be". The bank's resident counsel considered matters in the hands of very competent counsel of the debtor, and of representatives of the various security holders. The charge of $2,500 will be reduced to $500.

▮ Petitioner will be allowed one thousand one hundred seventy-five dollars and forty-six cents ($1,175.46) compensation and thirteen dollars and thirty-eight cents ($13.38) expenses.

An order may be submitted.